J-A18020-18

2018 PA Super 250

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMES BIDWELL | : | No. 16 EDA 2018 |

Appeal from the Order Entered December 15, 2017
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0002259-2016

BEFORE:   STABILE, J., STEVENS*, P.J.E., and STRASSBURGER**, J.

OPINION BY STEVENS, P.J.E.:                    **FILED SEPTEMBER 11, 2018**

The Commonwealth of Pennsylvania appeals from the Order entered on December 15, 2017, by the Honorable Margherita Patti Worthington, Court of Common Pleas of Monroe County, granting in part and denying in part its pretrial motion *in limine*. Following a careful review, we affirm.

The learned trial court summarized the relevant facts and procedural history according to the Commonwealth as follows:

> On June 2, 2011, at 7:39 p.m., Mr. Todd Bachman placed a 9-1-1 call to Monroe County Control Center reporting the discovery of the body of Kristin Wagner ("Victim"), hanging from an electrical heating wire tied to a refrigeration unit that was located in a trailer at 860 Crowe Road, Stroud Township. The trailer was located in a scrap yard operated by Christian Containers, LLC, a company owned by [Appellee]. Within minutes of the 9-1-1 call, members of the Stroud Area Regional Police Department and emergency medical service personnel arrived and observed the scene and body.
> The Victim's body presented with signs of *livor mortis*, a condition indicative that death had occurred several hours prior to its discovery. The condition had not yet set, thus narrowing the

_____
Former Justice specially assigned to the Superior Court.
** Retired Senior Judge assigned to the Superior Court.

time of death to not more than a few hours prior to discovery. The position of the Victim's body was such that the Victim's feet were resting on the floor with her knees bent and her hands free at her side. Heating wire was looped around the Victim's neck, but was not fashioned into a noose or otherwise twisted around her neck. The ligature had caused a well-defined furrow around the frontal and upper areas of the Victim's neck. The ligature did not appear to cause any abrasions or otherwise indicate that a struggle or involuntary movements had occurred prior to death. The Victim's face was not swollen or discolored, as is commonly seen in victims of hanging or ligature strangulation.

Alongside the body was a metallic box upon which, in the dust, prints from a work boot were identified. The pattern of the work boot prints were not made by the footwear of the Victim. There was also a coating of white substance, which was later identified as paint, visible on the Victim's right shoulder and both arms.

A cursory autopsy revealed there was no evidence of injury to the internal structures of the Victim's neck, no petechial hemorrhaging, and no discoloration of the face above the ligature. While the responding paramedics viewed the death as suspicious, the original investigators and the coroner concluded that the Victim committed suicide by hanging.

On June 5, 2014, Richard Gerber contacted the authorities and advised them that [Appellee] admitted to him that he had killed the Victim in the office trailer of the Crowe Street container yard by "choking her out" and thereafter hung her body in a refrigerated trailer to make it appear as though she had committed suicide. Based on Mr. Gerber's information, police initiated an investigation into the Victim's death. The investigation revealed that [Appellee] was never sought for questioning by the original investigators despite his owning the business where the Victim's body was discovered, engaging in an extra-marital affair with the Victim, and being the last person to see the Victim alive.

[Appellee] and the Victim were engaged in a sexual relationship beginning in May 2010. The relationship included [Appellee] supplying the Victim with quantities of methamphetamine and Percocet pills. During the fall of 2010, the Victim provided members of the Pocono Mountain Regional Police Department and Pennsylvania State Police with information about [Appellee] trafficking in large quantities of methamphetamine. Soon thereafter, acting in part upon the information supplied by the Victim, [Appellee] was subject to a traffic stop in which a quantity of methamphetamine was located. [Appellee] suspected

that the Victim informed the police about his drug trafficking and expressed his suspicion to his wife, Jennifer Bidwell. Less than a week after the Victim's death, [Appellee] was arrested for drug trafficking, based in part on the information previously supplied by the Victim.[1]

On June 2, 2011, the day of the Victim's death, Veronica Murray, owner of the Cinder Inn, a bar located on Crowe Road, saw the Victim and [Appellee] at the bar from approximately 12:00 p.m. to 3:00 p.m. The Victim and [Appellee] consumed alcohol and acted in a sexual manner toward one another. During this time, the Victim placed a phone call to her father, Donald Wagner, Sr. Cellular telephone records show that the phone call began at 3:55 p.m., lasted 20 minutes, and ended at approximately 4:15 p.m. [Appellee's] cellular telephone records show that he remained in the immediate vicinity of Crowe Road until approximately 5:09 p.m. on the day of the Victim's death.

At approximately 5:20 p.m. [Appellee] telephoned Jennifer Bidwell. The call lasted for approximately 9 minutes. During the call, [Appellee] was crying and said things such as "she's hanging" "she killed herself" and she "died." [Appellee] clarified that he was referring to the Victim. [Appellee] then called Donald Wagner at 7:28 p.m. This call lasted approximately 10 minutes, during which [Appellee] informed Mr. Wagner that the Victim was dead. The Victim's body was discovered by Mr. Bachman at 7:39 p.m., who called 9-1-1.

After discovering the Victim's body and calling 9-1-1, Mr. Bachman called his immediate supervisor, James Smith, to report the death and Mr. Smith called [Appellee] at 7:41 p.m. After being told by Mr. Smith that the Victim's body had been discovered at his Crowe Road container yard, [Appellee] claimed to be in Philadelphia and unable to return to the scene.

[Appellee] has made several contradictory statements regarding the circumstances of the Victim's death and his whereabouts at that time. [Appellee] claimed to employees and associates that he was in Philadelphia at the time of the death; that he left the Victim for a period of time and returned to find her dead; that the Victim left a suicide note; and implied that the Victim's 3:55 p.m. conversation with her father motivated her to commit suicide. Additionally, [Appellee] relayed to Jennifer Bidwell that the Victim needed money, so he agreed to allow her to paint his office trailer. [Appellee] stated to Mrs. Bidwell that while the Victim was painting the trailer he told the Victim he was reconciling with his wife and could not be there for her anymore but that God would be there. [Appellee] relayed that the Victim

stated "f*** God" and had an evil look in her eye and that this was the last time he saw the Victim.

The Victim's family and friends maintain that she would not have committed suicide. The Victim's calendar for May and June 2011 contained multiple entries for events involving her children and other planned events. The Victim did not display any signs of depression at the time. On June 2, 2011, Ms. Murray, owner of the Cinder Inn, observed the Victim as appearing happy and outgoing, speaking of her children, and sharing photographs.

On July 26, 2016, the Seventh Monroe County Investigating Grand Jury issued a Presentment at Investigation No. 6-2014 that recommended [Appellee] be arrested for violating Section 2501 of the Pennsylvania Crimes Code and additional sections of the Crimes Code. By Order date July 28, 2016, this [c]ourt, as Supervising Judge of the Investigating Grand Jury, accepted the Presentment and referred the matter to the Attorney for the Commonwealth.

[Appellee] was charged by Criminal Information on November 14, 2016, with Criminal Homicide.[2] On November 15, 2016, the Commonwealth filed a Motion for Status Conference. On November 17, 2016, we scheduled a status conference with Counsel. On November 21, 2016, the Commonwealth filed a Motion to Continue Scheduling Conference, which was granted. The status conference was rescheduled to November 29, 2016. At the status conference both parties were directed to file all pretrial motions on or before July 21, 2017.

The Commonwealth filed the present Motion *in Limine* on July 12, 2017. [Appellee] filed an Answer to the Commonwealth's Motion *in Limine* on August 15, 2017, and a Supplemental Memorandum of Law on October 10, 2017.

A hearing on the Commonwealth's motions was held on September 15, 2017, wherein the Commonwealth introduced a compact disc containing the following evidence:

1. A folder marked "Alyssa Benak" containing her audio-recorded interview with law enforcement, and corresponding transcript, on February 28, 2017;
2. A folder marked "Danielle Sickle" containing a report of her interview with law enforcement on January 30, 2017, an audio recording of same, a Pennsylvania State Police incident report dated November 23, 2014, and a Stroud Area Regional incident report dated November 23, 2014;

3. A folder marked "Denise Bidwell" containing her audio–recorded interview with law enforcement, and corresponding transcript, on August 23, 2016, and her medical records from St. Mary's Medical Center dated March 13, 2006;

4. A folder marked "Jennifer Bidwell" containing her audio–recorded interview with law enforcement, and corresponding transcript, on February 5, 2016, a Yahoo email message from [Appellee] dated January 16, 2011, a Yahoo email message from [Appellee] dated June 1, 2011, a "Complaint for Support" from Monroe County Case No. 126 CV 2011, a Pocono Mountain Regional Police incident report dated June 13, 2010, and a "Note to File" dated September 19, 2017;

5. A folder marked "Kristin Wagner" containing audio clips of recorded telephone conversations between the Victim and [Appellee], and corresponding transcripts, various Facebook pictures and posts from the Victim's account, various Facebook and Yahoo messages between the Victim and [Appellee], and the Victim's audio-recorded statements to Pocono Mountain Regional Police on November 17, 2010;

6. A folder marked "Research Motion in Limine" containing various opinions and briefs from unrelated matters, as well as articles and legislation addressing issues raised in the Commonwealth's Motion in Limine;

7. A folder marked "Soliciting Prostitutes" containing various Yahoo emails sent by [Appellee];

8. Docket statements from Commonwealth v. Bidwell, Case No. 1993 CR 2015 and Commonwealth v. Bidwell, Case No. 2816 CR 2011;

9. A report of Kenya Hadlock's interview with law enforcement on January 20, 2015;

10. A report of Clarke Kitchell's interview with law enforcement on March 10, 2015;[3]

11. A report of Nancy Reinacher's interview with law enforcement on January 6, 2015; and

12. A transcript of Richard Gerber's interview with law enforcement on June 5, 2014.

On October 24, 2017, [Appellee] filed a Motion *in Limine* seeking the exclusion of the Commonwealth's expert, Michael Lucas, or, in the alternative, a Frye hearing. Upon consideration of [Appellee's] Motion *in Limine* we Ordered Counsel for the

Commonwealth to file an answer and memorandum of law in support of their position on or before November 13, 2017. Said answer and memorandum were filed by the Commonwealth on November 13, 2017.

_____

[1]See Commonwealth v. Bidwell, Case No. 220 CR 2011.
[2] 18 Pa.C.S.A. § 2501(a). We note that the Indictment and Criminal Complaint from the Grand Jury include one charge each for Tampering with or Fabricating Physical Evidence (18 Pa.C.S.A § 4901(1)) and Hindering Apprehension or Prosecution (18 Pa.C.S.A. § 5105(A)(3)). These charges were not included in the Criminal Information.
[3] This file is inaccurately titled "Lary Kitchel Interview" on the compact disc marked C-1.

Trial Court Opinion, filed 12/15/17, at 1-7.

A hearing was held on the Commonwealth's Motion *in Limine* on September 15, 2017. Following a review of the evidence submitted at the hearing, the record, the parties' briefs, and the oral arguments of counsel, the trial court granted in part and denied in part the Commonwealth's Motion. The trial court issued a forty-five page Opinion in Support of its Order which reads as follows:

**ORDER**
**AND NOW,** this 15th day of December, 2017, after consideration of the Commonwealth's and [Appellee's] Motions *in Limine,* we hereby order the following:

1. The Commonwealth's Motion to admit evidence of [Appellee's] alleged drug trafficking is **GRANTED** in part and **DENIED** in part consistent with this Court's Opinion;
2. The Commonwealth's Motion to admit evidence of [Appellee's] drug use is **DENIED;**
3. The Commonwealth's Motion to admit 404(b) evidence of [Appellee's] violent behavior towards women is **DENIED;**
4. The Commonwealth's Motion to admit evidence of [Appellee's] infidelity is **GRANTED;**

5. [Appellee's] Motion to exclude testimony of Michael Lucas is **DENIED.**

On January 3, 2018, the Commonwealth filed a timely notice of appeal along with a Statement in Compliance with Pa.R.A.P. 311(d) wherein it certified that the trial court's December 15, 2017, Order either will terminate or substantially handicap the prosecution of Appellee.[1]  The trial court directed the Commonwealth to file a concise statement of the errors complained of on appeal, and the Commonwealth filed the same on January 4, 2018.

In its brief, the Commonwealth presents the following Statement of the Questions Presented:

> 1. Does the denial of the Commonwealth's Motion in Limine constitute reversible error, where, the lower court's reasoning rests upon basic mistake, including a misunderstanding of the nature of the wounds observed on the victim's body at autopsy; where that mistake was the basis of the lower court's conclusion that the circumstances of [Appellee's] other acts of violence toward women are not sufficiently similar or logically connected to the victim for proof of motive, intent, method, and to rebut the defense of suicide?

> 2. Did the lower court err by ruling that evidence of [Appellee's] drug use and its effect on him is barred as irrelevant where:  a) the record shows that [Appellee] and victim frequently ingested drugs together; (b) appeared under the influence of drugs and alcohol on the day of the murder; (c) [Appellee] was under the influence of drugs and/or alcohol during his prior assaults on the victim and other women, and; (d) [Appellee] would become paranoid while under the influence of drugs and

_____

[1] In light of this procedural posture, we may review this appeal.  **See** Pa.R.A.P. 311(d); **see also Commonwealth v. Gordon**, 543 Pa. 513, 517, 673 A.2d 866, 868 (1996) (holding that the denial of a motion *in limine* seeking to admit evidence falls within the rule that the Commonwealth may appeal pretrial orders which terminate or substantially handicap the prosecution).

alcohol; all as relevant to show possible motive and intent for the murder and give context into the relationship between [Appellant] and victim, as part of the chain or sequence of events that form the history of the case?

Commonwealth's Brief at 4. In considering these claims, we are mindful of the following:

> Admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. *See Commonwealth v. Arrington*, 624 Pa. 506, 86 A.3d 831, 842 (2014). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Sitler*, 144 A.3d 156, 163 (Pa. Super. 2016) (*en banc*) (citation omitted).
>
> Relevance is the threshold for admissibility of evidence. *See Commonwealth v. Cook*, 597 Pa. 572, 952 A.2d 594, 612 (2008). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." *Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 904 (2002) (citation omitted). "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402.
>
> One such law that limits the admissibility of relevant evidence is Rule 404. Under Rule 404, evidence of "a crime, wrong, or other act" is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, this evidence may be admissible when relevant for another purpose, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).
>
> ***
>
>> [m]erely crossing the threshold of demonstrating that other-acts evidence was probative of some Rule 404(b)(2) category does not, by itself, demonstrate

- 8 -

admissibility. "In a criminal case this evidence is admissible *only* if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2) (emphasis added). In this context, "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." ***Commonwealth v. Dillon***, 592 Pa. 351, 925 A.2d 131, 141 (2007).

Often cited in conjunction with this balancing test, as invoked by the trial court in this case, is our Supreme Court's elucidation on the topic of prejudice in ***Commonwealth v. Lark***, 518 Pa. 290, 543 A.2d 491 (1988):

Not surprisingly, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged, as appellant would have preferred.

***Id.*** at 501.

Naturally, as the ***Lark*** Court suggests, relevant evidence of [Lynn's] culpability for the charged offenses should not be excluded merely because it tends to demonstrate his guilt. However, our Supreme Court has also advised that, "to be admissible under the [motive] exception, evidence of a distinct crime, *even if relevant to motive*, 'must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances.' " ***Commonwealth v. Roman***, 465 Pa. 515, 351 A.2d 214, 218–219 (1976) (emphasis added). Thus, we must not forget that the rule being applied is that other-acts evidence is by default inadmissible *unless* a Rule 404(b)(2) category or similar justification applies, *and* the probative value of that evidence outweighs its *potential* for prejudice. The burden is on

> the party seeking admission to demonstrate the applicability of the exception to the general rule; in this case, that burden fell on the Commonwealth. There is no presumption of admissibility of other-acts evidence merely because it is somewhat relevant for a non-propensity purpose.
>
> *Lynn III*, No. 2171 EDA 2012, at 29–30, 2015 WL 9320082, at *14 (emphasis in original).

*Commonwealth v. Lynn*, 2018 WL 3153472, at *3-5 (Pa.Super. filed June 28, 2018).

The Commonwealth initially asserts evidence of Appellee's alleged violence toward four other women is relevant to prove motive, intent and method herein and to rebut the defense that the Victim committed suicide. Commonwealth's Brief at 31. The Commonwealth reasons:

> [t]hese violent acts include attacking women with his bare hands, while facing them; attacking them from the front, clutching their throat and neck areas, choking and strangling them. All the women were involved in either sexual relationships or situations with [Appellee]. The triggering events vary only in insignificant details but have as common elements [Appellee's] need for control, submission to his desires, and viewing any challenge to his authority as a threat to his masculinity.
>
> ***
>
> Here, the evidence shows [Appellee] used violence when he did not get his way or the women with whom he was in sexual situations opposed him or otherwise did not comply with his desires. He was seen by one witness grabbing the victim by the throat while facing her and threatened to kill her. He engaged in a pattern of controlling and jealous behavior toward women with whom he was in a relationship. All of the women were choked from the front by [Appellee] who became violent when they would not comply with his wishes. Drugs and/or alcohol was involved in all of the assaults. And significantly, none of the assaulted women showed physical signs of injury.

Commonwealth's Brief at 31, 35.

The trial court excluded the other-acts evidence reasoning that it was "improper propensity evidence of Appellee's prior, dissimilar assaults on other women." **See** Statement Pursuant to Pa.R.A.P. 1925(a) at 2 (citing Opinion, filed 12/15/17, at 22-35). The trial court stressed that in doing so, it "did *not* exclude any prior alleged attacks on [the Victim]- only prior alleged attacks on Denise Bidwell, Jennifer Bidwell, Alyssa Benek, and Danielle Sickle. . . . To clarify, we did not, nor do we believe we should, exclude [Appellee's] alleged prior attack on [the Victim] as evidenced by Lary Kitchell's statement to police." **Id**. (emphasis in original) (citation to record omitted).

The trial court meticulously detailed and analyzed the proffered testimony of each woman as gleaned from the Commonwealth's various exhibits and ultimately determined it to be inadmissible as follows:

### Defendant's Alleged Tumultuous and Violent Relationships with Females

> The Commonwealth proffers witness accounts that [Appellee] assaulted Denise Bidwell, Jen[n]ifer Bidwell, Alyssa Benek, and Daniell Sickle in a manner consistent with the later, fatal assault upon the Victim, Kristen Wagner. The Commonwealth offers this evidence for several reasons: proving the motive of [Appellee], proving [Appelle's] identity as the perpetrator of the crimes against Victim, and showing the absence of any suicide of Victim. See Com.'s Mot., ¶¶ 7-10.
>
> As a preliminary matter, as the Superior Court noted in Commonwealth v. Weakley, a court must necessarily look for similarities in a number of factors when comparing the methods and circumstances of other crimes sought to be introduced through Rule 404(b), including:
>
> > (1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. Remoteness in time between the crimes

> is also factored, although its probative value has been held inversely proportional to the degree of similarity between crimes.

Commonwealth v. Weakley, 972 A.2d 1182, 1189 (Pa. Super. 2009) (internal citation omitted).

To show a common plan or scheme, crimes must be so related that proof of one tends to prove the others. Commonwealth v. Elliott, 700 A.2d 1243, 1249 (Pa. 1997), abrogated on other grounds by Commonwealth v. Freeman, 827 A.2d 385 (Pa. 2003). Similarities cannot be confined to insignificant details that would likely be common elements regardless of the individual committing the crime. See Commonwealth v. Hughes, 555 A.2d 1264, 1283 (Pa. 1989). Evidence of a common scheme can establish any element of a crime, such as identity and mental state, so long as the scheme is not being used just to establish a propensity of the defendant to commit crimes. See Commonwelath v. Miller, 664 A.2d 1310, 1318 (Pa. 1995), abrogated on other grounds by Commonwealth v. Hanible, 836 A.2d 36 (Pa. 2003).

In determining if prior incidents show a common plan or scheme, the [c]ourt should focus not just on a defendant's actions, but on the factual circumstances of the incidents in their entirety. See Commonwealth v. O'Brien, 836 A.2d 966, 970-71 (Pa. Super. 2003). Stated differently, the similarities of the incidents need not lay solely in the perpetrator's acts, but in the shared similarities in the details of each crime. See Commonwealth v. Newman, 598 A.2d 275, 278 (Pa. 1991).

In Elliott, the Pennsylvania Supreme Court found that a common plan or scheme existed when: the defendant approached three different women of similar age and ethnicity, outside of the same night club, at a similar time of night; the defendant beat or choked each of the women, or both, after getting the women alone; and the defendant's assaults all had sexual overtones. Elliott, 700 A.2d at 1249-50. In Miller, the Supreme Court found that a logical connection establishing a common scheme existed when: the defendant lured three women with similar physical characteristics to his vehicle; took those women to remote areas for sexual purposes against their will; and brutally beat those women in a similar manner, attempting to cause or actually causing the deaths of those women. Miller, 664 A.2d at 1318.

In Commonwealth v. Ross, the Superior Court found that the defendant's crimes showed that the defendant was a domestic abuser of women with whom he was involved in long term

relationships. Ross, 57 A.2d at 104. However, this scheme of domestic abuse was insufficient to show a common plan or scheme relevant to the murder on trial in Ross because the murder on trial was far more brutal than the previous instances of abuse.[6] Id. Furthermore, the use of biting and duct tape in the murder was not present in the other instances of domestic abuse. Id.

In Commonwealth v. Einhorn, 911 A.2d 960 (Pa. Super. 2006), the Superior Court found that a common plan or scheme existed when a series of the defendant's diary entries showed: the defendant's particular beliefs about the necessity of ending a relationship with violence; a woman ending a relationship with the defendant motivated all three of his prior attacks; that the defendant claimed he loved each woman; that the defendant wrote about his violent feelings in his diary; and that the defendant's attacks became increasingly more severe in their violence after each break-up. Einhorn, 911 A.2d at 968.

The concept of proof of identity is similar but distinct from the concept of showing common scheme. See id. (finding that evidence of the defendant's prior assaults helped establish a common plan or scheme, which was relevant in establishing the defendant's identity as the victim's murderer). To show identity, the prior crimes and the case at bar must have such a logical connection that proof of the prior crimes naturally shows the accused committed the crime being tried. See Commonwealth v. Levanduski, 907 A.2d 3, 17 (Pa. Super. 2006). Stated another way, the crimes must have such a correlation in their details that proof that a person committed those crimes makes it very unlikely that anyone else committed the crimes at trial. See Weakley, 972 A.2d at 1189.

"Here, *much more is demanded than the mere repeated commission of crimes of the same class*, such as repeated burglaries or thefts. *The device used must be so unusual and distinctive as to be like a signature*." Ross, 57 A.3d at 102 (emphasis in original) (quoting Commonwealth v. Shively, 424 A.2d 1257, 1259 (Pa. 1981)).

Different end results for each crime in a set of crimes can be significant, but are not necessarily determinative in whether two crimes constitute a sufficient logical connection to prove identity of the perpetrator. See Weakley, 972 A.2d at 1190 (finding a bad act where a murder resulted, and a bad act where a murder did not result, were indistinguishable because the non-murdered victim was threatened with murder, but was afforded the opportunity to flee when an alarm system went off).

- 13 -

In <u>Ross</u>, the Superior Court said the testimony of the three proposed witnesses only established a common thread of physical and/or sexual assaults with a foreign object, and this was insufficient for a crime sufficiently unique to signify an identifying signature. <u>Ross</u>, 57 A.3d at 102. The three witnesses' incidents in <u>Ross</u> were distinguishable from each other in that: each incident had a different triggering cause, there were differences in the foreign object the defendant used, there were differences in whether penetration was attempted with the foreign object, and the defendant only forced one of the witnesses to engage in oral and anal sex. <u>Id</u>. at 102-03.

Further, in <u>Ross</u>, the past crimes committed against the three witnesses were distinguishable from the case being considered at trial. For the three prior witnesses, the defendant had a long-standing, cohabiting relationship (i.e. wife, girlfriend, fiancée) with the victims before committing the acts of domestic violence. <u>Id</u>. at 103. In the case at trial, the defendant had only just met the victim that night. <u>Id.</u>; <u>but cf</u>, <u>Weakley</u>, 972 A.2d at 1190 (stating that a previous crime could be used to show identity because the crime had a similar "template" to the crime on trial, even though the first crime was committed against an acquaintance and the second crime was committed against an unfamiliar victim). Also, though the acts of domestic violence committed against the three witnesses were abhorrent, they did not rise to the level of brutality of the crime before the Superior Court.[7] <u>Ross</u>, 57 A.3d at 103.

To show motive or intent for a killing, the evidence of the prior acts must give sufficient grounds for believing the crime at trial grew out of the prior facts and circumstances, or the prior facts and circumstances caused the crime at trial. <u>See Commonwealth v. Schwartz</u>, 285 A.2d 154, 158 (Pa. 1971), <u>abrogated on other grounds by</u> <u>Commonwealth v. DeMarco</u>, 809 A.2d 256 (Pa. 2002). The mere identification of similarities between prior bad acts and the crime at issue cannot, on its own, establish motive. <u>See</u> <u>Ross</u>, 57 A.3d at 101.

In <u>Schwartz</u>, a case where the defendant shot and killed a police officer, the Pennsylvania Supreme Court found that the trial court did not abuse its discretion in deciding the defendant's prior killing of a police officer did not imply a logical probability the defendant "would shoot a policeman at every opportunity." <u>See</u> <u>Schwartz</u>, 285 A.2d at 158.

In <u>Ross</u>, the Superior Court stated that the testimony of three female witnesses did not establish a set of facts sufficient to show that the crime on trial "grew out of or was in any way caused

by the prior set of facts and circumstances." See Ross, 57 A.3d at 101 (internal citation omitted). The Commonwealth argued that the three witnesses' testimony "demonstrated that women in [the defendant's] presence risked being physically and/or sexually assaulted if they were unreceptive to his sexual advances." Id. One witness testified she was assaulted for being receptive to the defendant's advances. See id. Another witness testified she was assaulted after looking in the defendant's bag, rather than after she refused his sexual advances. Id. The third witness testified that the defendant was abusive during sex, but did not imply this was because of the witness's lack of receptiveness. Id. The Superior Court found that this testimony did not support the Commonwealth's proposed strain of commonality, and thus did not establish motive for the defendant's subsequent crime.[8] Id.

Motive and intent are closely related to the defense of lack of accident. To prove lack of accident, a party may show that *because* there is evidence of motive or intent, that evidence also shows lack of accident. See, e.g., Commonwealth v. Billa, 555 A.2d 835, 840 (Pa. 1989); Commonwealth v. Travaglia, 467 A.2d 288, 297 (Pa. 1983); Commonwealth v. Norman, 549 A.2d 981, 984 (Pa. Super. 1988).

At least in a murder case, the defense need not raise lack of accident before the prosecution puts on evidence of lack of accident. See Commonwealth v. Boczkowski, 846 A.2d 75, 88 (Pa. 2004). Because there are only a limited number of ways that an individual can die (suicide, natural causes, accident, homicide), and the Commonwealth must prove homicide beyond a reasonable doubt, part of the Commonwealth's case-in-chief can involve excluding the possibility of death by a manner other than homicide. See id.

In order to properly evaluate the alleged bad act evidence we first need to understand the proposed testimony. The proffered testimony of Denise Bidwell, Jennifer Bidwell, Alyssa Benek, and Daniell[e] Sickle, according to the Commonwealth's exhibit, is as follows:

Denise Bidwell was [Appellee's] first wife. Her proposed testimony[9] references an abusive relationship from the time they were teenagers continuing until after their divorce, when [Appellee] would force her to have sex with him in exchange for child support. Denise Bidwell's testimony specifically chronicled one incident where she alleges [Appellee] grabbed her by the throat and pushed her against a wall in their home. Her head hit the wall knocking a picture to the floor. Due to [Appellee] chocking [sic] her, Denise Bidwell stated "I would have been dead, 'cause I

saw it and I was fading out and I saw it in his eyes, he wanted me dead. He was drunk. . . . " [Appellee] only stopped chocking [sic] her when their children came out of their rooms. Denise Bidwell left the home with their children as [Appellee] attempted to apologize for his actions. Denise Bidwell did go to the hospital where the medical records reflect she had a bruised larynx. Com. Ex. 1, Transcript of Denise Bidwell, pp. 21-24[.]

[Appellee's] second wife, Jennifer Bidwell's, proposed testimony consists only of a "Note to File" the author of said "note" is unknown. The note to file reads:

During interview with Jennifer Bidwell, (August 29, 2017) she disclosed that

earlier in the marriage with [Appellee], the couple had been arguing. The argument had to do with sex. [Appellee] grabbed Jennifer's throat. She felt her air completely cut off. [Appellee] released her and apologized. Jennifer was emotional when recounting the episode. Present at interview were Detective Luthcke and Serfass, as well as ADA Metzger.

Com. Ex. 1, Jennifer Bidwell.

The Offer of Proof for Danielle Sickle's assault at the hands of [Appellee] is offered in the form of a memo by Detective Lutchke memorializing an interview with Ms. Sickle. The memo details how Ms. Sickle responded to an ad on Craig's List for a receptionist job at [Appellee's] business. Ms. Sickle states she arrived for an interview with [Appellee] and was lead into his office. At some point during the interview, Adam Campbell walked into the office and he and [Appellee] did a line of Meth on the desk. Mr. Campbell then left the office. [Appellee] then moved around the desk next to Ms. Sickle and grabbed her by the arm explaining how he gets prostitutes from Craig's List and brings them back to his office for sex. Ms. Sickle reports that she kept telling [Appellee] "no," but he kept trying to pin her to the couch. At one point [Appellee] hit her in the temple which caused her to go "loopy." Ms. Sickle stated [Appellee] was trying to rape her and he tore her cloths [sic] and began chocking [sic] her first using one hand, then using both hands. Ms. Sickle kept fighting with [Appellee] as he was trying to turn her around and was able to get away. She ran into the junk yard where she saw her car blocked in. Ms. Sickle also saw Mr. Campbell, who took her to his residence where they spent two days and two nights together. Ms. Sickle then returned to [Appellee's] property in order to get her car, but it was locked behind the gate. She called Stroud Area Regional Police in an attempt to get the car back. A police report

was submitted by the Commonwealth verifying a call concerning ownership of the car. Com. Ex. 1, Transcript of Sickle, pp 1-2.

Finally, the Commonwealth submitted a transcript of Alyssa Benek's Grand Jury testimony as an Offer of Proof of her alleged abuse. Ms. Benek was originally in a consensual sexual relationship with [Appellee]. A point repeatedly clarified by Detective Serfass who initially asked if Benek's sexual relationship with Defendant was mutual, to which she replied "Yep." Com. Ex. 1, Transcript of Alyssa Benek, p. 35. The questioning went on:

Detective Serfass: You - you were willing -
Ms. Benek: Yep.
Detective Serfass: -- like you would willingly have -
Ms. Benek: Yep.
Detective Serfass: -- Intercourse with him -
Ms. Benek: Yep.
Detective Serfass: -- or have -
Ms. Benek: Yep.
Detective Serfass: -- relationship with him?
Ms. Benek: Yep.

Id. at pp. 35-36.

Ms. Benek would go on to explain her relationship with [Appellee] became nonconsensual after she heard a rumor that he attempted to shoot someone. However it does not appear from the transcript that Ms. Benek ever expressed her desire to change the parameters of her relationship with [Appellee]. Rather, she states she just continued to comply and have sex with [Appellee] because she felt it was inevitable. Id. at p. 50. Detective Serfass then asks: "When-when he would sexually assault you, was there ever any - was he physically violent? How - how did he act towards you? Ms. Benek responds: "No, it - and it almost became that I was just like, there's no way, you know what I mean?" Detective Serfass then asked if [Appellee] ever choked her to which Ms. Benek replied no. Detective Serfass then asks if [Appellee] ever threatened to kill her to which Ms. Benek says "Yeah and my whole family."

Comparing the proposed testimonies of Alyssa Benek, Danielle Sickle, Denise Bidwell, and Jennifer Bidwell they have basic commonalities but also stark differences. In all four incidents, [Appellee] allegedly assaulted the women. See Com. Ex. 1. However, in comparing the said proffered testimonies within the context of the factors outlined in Weakley, the proposed testimony is inadmissible. These Weakley factors, which this

[c]ourt must consider when comparing the facts and circumstances of the crimes or acts, include: (1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. Weakley, 972 A.2d at 1189. Remoteness in time between the crimes is also a factor, but its probative value is inversely proportional to the degree of similarity between crimes. Id.

Regarding factors (1) and (3), the two factors we find most compelling, three of the four incidents involve sudden, violent reactions on the part of [Appellee] in response to the victims' failure to agree with [Appellee]. See Com. Ex. 1. The fourth incident involved repeated nonviolent sexual abuse. This stands in glaring contrast to the Commonwealth's theories in the present case. As described above our reading of the Commonwealth's argument is that the Commonwealth has alleged two theories for why [Appellee] might have murdered the Victim, both of which involve premeditation rather than a sudden violent outburst: (1) retaliation for the Victim providing incriminating evidence concerning [Appellee's] alleged drug trafficking to the police and/or (2) because she was his mistress and he was attempting to reconcile with his wife. Com.'s Mot., ¶¶ 11, 17-18. In only two of the incidents [Appellee] was reacting to the witnesses' resistance to his sexual advances (Ms. Sickle and Ms. J. Bidwell).[10] Id. In one incident [Appellee] was allegedly drunk (Ms. D. Bidwell) and another [Appellee] had just snorted methamphetamine (Ms. Sickle). Id. In three of the four incidents [Appellee] choked the victims (Ms. D. Bidwell, Ms. J. Bidwell, and Ms. Sickle). Id. Three of the incidents [Appellee] was in a long term sexual relationship (Ms. D. Bidwell, Ms. J. Bidwell, and Ms. Benek). The other victim was unknown to [Appellee] at the time of the alleged incident. Id.

Regarding factor (5), in three of the incidents [Appellee] had or was attempting to have a sexual relationship with the victims. See id. [Appellee] also had an ongoing sexual relationship with Victim in the case at bar.

Regarding factor (2), [Appellee] attacked three of the witnesses at the neck, using his hands, (Ms. D. Bidwell, Ms. J. Bidwell, and Ms. Sickle). See id. While in the present case the Commonwealth's expert opines that the marks on Victim's neck are consistent with pressure from wire. See Com. Expert Report of Michael Lucas p. 4. Regarding factor (4), the locations are split between [Appellee's] home and [Appellee's] place of work. See id.

When reviewing all the factors some point to commonality, such as factor four, while others do not, factors one and three. However, this [c]ourt need not weigh every factor equally in

finding commonality among incidents. See Weakley, 972 A.2d at 1189. Nor is discord required in every Weakley factor in order to bar admission. See id. A showing of common plan or scheme requires crimes so related that proof of one tends to prove the others. Elliott, 700 A.2d at 1249. The [c]ourt should focus on the factual circumstances of the incidents in their entirety. See O'Brien, 836 A.2d at 970-71. The similarities of the incidents need not lay solely in the acts which compose the crime and which the perpetrator performed. See Newman, 598 A.2d at 278. Insignificant details that would likely be common elements regardless of the individual committing the crime do not sufficiently show similarity. See Hughes, 555 A.2d at 1283. Thus, after our review, disharmony in factors out ways [sic] their consistency and the Commonwealth's motion must be **DENIED**.

Our current holding is supported by the Pennsylvania Supreme Court's recent holding in [] Commonwealth v. Hicks, a case arising from this jurisdiction. 156 A.3d 1114 (Pa. 2017). In Hicks, the Pennsylvania Supreme Court, in a plurality opinion affirming our holding, discussed, and seemingly heightened, the commonality needed in admitting 404(b) in a plurality opinion:

> This Court has long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity-or logical connection-between the proffered prior bad acts and the underlying charged crime. As early as 1872, in Shaffner v. Commonwealth, 72 Pa. 60 (1872), the Court described the importance of such a connection as follows:
> It is a general rule that a distinct crime, unconnected with that laid in the indictment, cannot be given in evidence against a prisoner. It is not proper to raise a presumption of guilt, on the ground, that having committed one crime, the depravity it exhibits makes it likely he would commit another. . . . To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other. Id. at 65. *See also* Wable, 114 A.2d at 336-37 (1955) (there must be "such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other");

- 19 -

Com. v. Chalfa, 169 A. 564, 565 (1933) (other bad acts evidence "must show some logical connection between the offenses"). "Sufficient commonality of factors" between the other incidents and the underlying crime "dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator." Com. v. Weakley, 972 A.2d 1182, 1189.

In further explaining the logical connection standard, this Court has noted "much more is demanded than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. The device used must be so unusual or distinctive as to be like a signature." Com. v. Rush, 538 Pa. 104, 646 A.2d 557, 560-61 (1994) (crimes containing uniquely similar attributes constitute a signature), *quoting* McCormick on Evidence, § 190 at 449 (2d Ed. 1972) (emphasis omitted). *See also* Com. v. Hughes, 521 Pa. 423, 555 A.2d 1264, 1282 (1989) (similarities in crimes not confined to insignificant details represent a signature); Weakley, 972 A.2d at 1189 (identity of perpetrator in underlying crime may be proved through other acts where they "share a method so distinctive and circumstances so nearly identical as to constitute the virtual signature of the defendant").

Id. at 1125-26.

Justice Saylor in a concurring opinion further addressed the specific exception of lack of accident. Justice Saylor begins his Opinion by agreeing with the plurality that "majority opinions of the Supreme Court have substantially diluted the putatively stringent standard" associated with 404(b) evidence. However, he notes "the logical relevance of other bad-act evidence so employed to demonstrate lack of accident does not depend on as great a degree of similarity, as between the charged and uncharged misconduct. . . ." Id. at 1131-32. Justice Saylor analyzed lack of accident under a test new to Pennsylvania Jurisprudence but widely used in other jurisdictions, the doctrine of chances:

To determine whether the asserted theory qualifies [as a non-character-based theory of logical relevance], the trial judge must trace the entire chain of inferences

underlying the theory. The theory passes muster if the inferential path between the item of evidence and a fact of consequence in the case does not require any inferences as to the defendant's personal, subjective character. [T]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the defendant *or the defendant becoming innocently enmeshed in suspicious circumstances so frequently*.

Id. at 1133 (emphasis in original). Even under Justice Saylor's "doctrine of chances" and its reduced similarity threshold the Commonwealth's contention fails. Justice Saylor suggests the evidence is introduced to show the improbability of so many accidents befalling the defendant, however, [Appellee] here has not been "enmeshed in any other suspicious circumstances" as necessitated by the test. Justice Saylor concludes warning "I maintain concerns about the power of potentially inevitable character inferences associated with other-acts evidence, with requiring defendants to effectively defend mini-trials concerning collateral matter, and about the efficacy of jury instructions in this context." Id. at 1138.

---

[6] Against the three witnesses, the defendant committed acts of violence punching victims, including: throwing victims against a wall, choking victims, oral and anal rape of a victim, and pulling victims' hair. Ross, 57 A.3d at 99- 100. In contrast, in the crime before the court in Ross, the perpetrator had severely mutilated the victim's body, using massive force to tear the muscle wall between the sphincter and the vagina. Id. at 103. Further, the defendant had left bite marks on the victim's breast, duct -taped the victim's hands, head, mouth, and arms, and held the victim's body underwater. Id.

[7]See footnote 6, supra.

[8] The Superior Court did not definitively state whether testimony establishing that women unreceptive to the defendant's sexual unreceptive to the advances risked being physically or sexually assaulted would be sufficient to show motive, just that the testimony in that case did not make such a showing. See Ross, 57 A.3d at 101 (emphasis omitted).

[9] The Commonwealth's Offer of Proof consists of an audio recording of Denise Bidwell's interview with Detective Lutchke along with a transcript of said interview and hospital records from Saint Mary's Hospital in Langhorne, Pa.

[10] It is unknown what triggered the events described by Ms. D. Bidwell. *See* Com. Ex. I. Further, there doesn't seem to be a definitive starting point for the Benek assaults as it doesn't appear [Appellee] was aware of Benek's reluctance. Id.

Trial Court Opinion, filed 12/15/17, at 22-35.

Upon our review of the record, given our standard of review, we cannot find that the trial court abused its discretion in limiting the introduction of other-acts evidence as it pertained to the aforementioned females.

This Court has cautioned that a mere identification of similarities between one's prior bad acts and the crime at issue does not establish his or her motive. Rather, there must be a firm basis for concluding that the crime currently on trial "grew out of or was in any way caused by the prior set of facts and circumstances." **Commonwealth v. Ross**, 57 A.3d 85, 100 (Pa.Super. 2012) (*en banc*) (quoting **Commonwealth v. Martin**, 479 Pa. 63, 68-69, 387 A.2d 835, 838 (1978)).  As the trial court found, while there were some similarities between the prior bad acts testimony the Commonwealth seeks to present at trial and Appellee's behavior toward the Victim, the proffered testimony does not establish a motive for the murder of the Victim.

The Commonwealth's evidence failed to show that each woman was assaulted in the same manner or had been involved in a sexual relationship with  Appellee or that Appellee was under the influence of alcohol or drugs at the time of the encounters with the women. To the contrary, the women's

testimony establishes, at most, the commission of crimes or conduct in the past "of the same general class," namely physical and/or sexual assaults. Their testimony does not evidence any particular distinctive pattern of behavior by Appellee in that Appellee's allegedly abusive behavior appears to have been triggered in each incident by different causes. For instance, it is alleged that Appellant assaulted his wives during the course of their marriages, but he spontaneously attacked Ms. Sickle whom he had just met while she interviewed for a job. Ms. Benek indicated Appellee did not physically accost her.

In addition, the trial court found that the prior bad acts testimony was not admissible to prove a "common scheme, plan or design." Under Pennsylvania law, evidence of prior bad acts is admissible to prove "a common scheme, plan or design where the crimes are so related that proof of one tends to prove the others." *Commonwealth v. Elliott*, 549 Pa. 132, 145, 700 A.2d 1243, 1249 (1997). In *Elliott*, the appellant had been accused of sexually assaulting and killing a young woman whom he had approached outside a nightclub at 4:30 a.m. The Pennsylvania Supreme Court affirmed the trial court's decision to permit three other young women to testify that the appellant also had preyed upon and physically and/or sexually assaulted each of them as they left the same club in the early morning hours. *Id.* at 146, 700 A.2d at 1250–51. Our Supreme Court held that evidence of the similarities

among the assaults was admissible to establish a common scheme, plan or design. ***Id****.*

As the trial court found herein, the proposed testimony of Denise Bidwell, Jennifer Bidwell, Alyssa Benek and Danielle Sickle does not establish a pattern of conduct on the part of Appellee so distinctive that proof of one tends to prove the others. Instead, the prior bad acts testimony demonstrates that Appellee was a domestic abuser of women, some of whom he was involved in on-going romantic relationships in the past, but it does not show a unique "signature" *modus operandi* relevant to the Victim's murder. ***Ross***, ***supra*** at 104. The ***Ross*** Court emphasized,

> The purpose of Rule 404(b)(1) is to prohibit the admission of evidence of prior bad acts to prove "the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). While Rule 404(b)(1) gives way to recognized exceptions, the exceptions cannot be stretched in ways that effectively eradicate the rule. With a modicum of effort, in most cases it is possible to note some similarities between the accused's prior bad conduct and that alleged in a current case. To preserve the purpose of Rule 404(b)(1), more must be required to establish an exception to the rule—namely a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question. No such close factual nexus exists in this case, and this Court has warned that prior bad acts may not be admitted for the purpose of inviting the jury to conclude that the defendant is a person "of unsavory character" and thus inclined to have committed the crimes with which he/she is charged. *See, e.g.,* ***Commonwealth v. Kjersgaard***, 276 Pa.Super. 368, 419 A.2d 502, 505 (1980). Based upon our review of the record, we must conclude that the testimony of Berardinelli, Maloney, and Levine was used to establish that Ross was an abusive man who in the past was physically and sexually abusive to his romantic partners so that the improper inference could be drawn that he was capable of, and had the propensity for, committing the types of grotesque

acts of physical and sexual abuse inflicted upon Miller resulting in her death.

***Commonwealth v. Ross***, 57 A.3d 85, 105 (Pa.Super. 2012).

Moreover, the proffered evidence does not work to rebut Appellee's theory that the Victim committed suicide, for other than its bald assertions, the Commonwealth has failed to show how Appellee's alleged violent behavior toward other women has any connection to whether the Victim took her own life. Commonwealth's Brief at 31, 37. Because we find no error in the trial court's determination that prior bad acts evidence in the form of proposed testimony of the four women was insufficient to establish a common plan or scheme under Pa.R.E. 404(b), we cannot find the court abused its discretion in denying the Commonwealth's motion *in limine*.[2]

The Commonwealth next challenges the trial court's refusal to permit evidence of Appellee's habitual drug use. The Commonwealth maintains the evidence of Appellee's drug use and its effect upon him along with his use of alcohol was relevant to show his "state of mind, intent, lifestyle with the victim, and to reconstruct the murder and its aftermath." ***See*** Motion *In Limine*, filed 7/12/17, at 14; Commonwealth's Brief at 41-42. The

---

[2] Of course, our disposition of this issue should in no way be read to affect the Commonwealth's ability to introduce evidence, including the testimony of eye-witnesses, with respect to Appellee's acts of violence upon the Victim. Indeed, the Appellee recognizes "the trial court properly permitted the Commonwealth to introduce evidence that Appellee had previously assaulted the [V]ictim in accordance with Pennsylvania case law." ***See*** Brief for Appellee at 46 (citations to caselaw omitted).

- 25 -

Commonwealth asserts the fact that Appellee's relationship with the Victim was "centered around drugs is part of the natural development and history of the case" as is the fact that he provided the Victim and other women drugs at times prior to the murder. *Id*. at 41-42, 44. The Commonwealth further baldly states the fact that Appellee and the Victim were together in a bar in the hours prior to the murder and drugs were found in the Victim's system at the autopsy serves as evidence "connecting [Appellee] to drug and alcohol abuse" and "allows for the inference, the probative value (however slight) that [Appellee] too had taken drugs and alcohol." *Id*. at 44-45.

The trial court found evidence of Appellee's use of alcohol and drugs in general to be irrelevant and inadmissible, but, importantly, "reserve[d] further decision on this issue to the time of trial." In doing so, the trial court reasoned:

> The Commonwealth alleges that [Appellee] was a frequent user of methamphetamine and that his use of same would result in his "stay[ing] awake for hours or days on end and [craving] sexual gratification to the point where he identifies himself . . as a sex addict." Com.'s Mot., ¶ 19. Beyond [Appellee's] use of the same drug as the Victim and his trafficking in same, the Commonwealth has proffered little to show the relevance of [Appellee's] use of this illegal substance in the alleged murder of the Victim. Indeed, the Commonwealth seems to treat [Appellee's] alleged involvement in drug trafficking as interchangeable with his substance abuse. Com.'s Memo, pp. 14-15. We, however, view each separately and find, based on the Commonwealth's proffer and for the reasons stated below, that evidence of [Appellee's] drug use is irrelevant and, thus, inadmissible.
>
> ***

The charge at issue here is Criminal Homicide. Our reading of the Commonwealth's offer of proof presently before the [c]ourt is that the Commonwealth has alleged two theories for why [Appellee] might have murdered the Victim: (1) retaliation for the Victim providing incriminating evidence concerning [Appellee's] alleged drug trafficking to the police and/or (2) because she was his mistress. Com.'s Mot., ¶¶ 11, 17-18. Only one of those theories has to do with drugs, and even that theory has no bearing on [Appellee's] own drug use. While we recognize that "[e]vidence to prove motive is generally admissible," we fail to see how the Commonwealth intends to connect [Appellee's] drug use with either of its proffered motives for the Victim's murder. See Commonwealth v. Philistin, 53 A.3d 1, 16-17 (Pa. 2012).

For example, the Commonwealth has failed to present evidence that would show how [Appellee's] drug use played a role in his alleged motive to kill the Victim because of her incriminating statements to police. Indeed, the evidence presented by the Commonwealth tends to show that [Appellee] was angry because the Victim spoke to the police about his alleged drug *trafficking*, not his drug *use*. See Com.'s Ex. 1, Recorded Statement of Jennifer Bidwell, p. 5-6. Drug trafficking does not necessarily involve drug use by the trafficker. Furthermore, the Commonwealth has not alleged, nor does the evidence before us reflect, that [Appellee] killed the Victim in a rage induced by methamphetamine or lack of sleep. Indeed, there is no evidence before us that [Appellee] was using any illegal substance on the day of the Victim's death. Similarly, the Commonwealth has not posited a theory of sexual violence by [Appellee] toward the Victim on the day of her death, as might be expected from a man who uses methamphetamine and then "crave[s] sexual gratification to the point where he identifies himself .. as a sex addict." Com.'s Mot., ¶ 19.

Based upon the Commonwealth's offer of proof and the evidence currently before the [c]ourt, we can find no relevance in the evidence regarding [Appellee's] drug use. Accordingly, at this time, we find this evidence to be irrelevant and inadmissible and the Commonwealth's Motion to admit such evidence is DENIED and we reserve further decision on this issue to the time of trial.

Trial Court Opinion, filed 12-15/17, at 20-22.

In light of the foregoing, the Commonwealth is mistaken when it argues

the "lower court abused its discretion by creating an unrealistic standard for

determining relevancy on this point; namely, that the Commonwealth must show by specific and direct evidence that [Appellee] ingested [methamphetamine]. This would exclude all circumstantial evidence on that point." Commonwealth's Brief at 45. The trial court created no such standard, for a plain reading of its decision reveals it has left the door open for the Commonwealth to present testimonial, circumstantial, or other relevant evidence to establish that Appellee was under the influence of drugs, alcohol, or both at the time of the murder. This is clarified in the trial court's Rule 1925(a) Opinion where it indicated that at this juncture it "simply has no evidence before [it] that shows [Appellee] was under the influence of any substance at the time [the Victim] was murdered." The trial court also emphasized that the Commonwealth had presented this argument for the first time on appeal as a way to connect his drug use with the Victim's death through the use of his prior bad acts against other women in the context of Pa.R.E. 404(b). Trial Court Opinion, filed 2/16/18, at 6-7. The court concluded:

> Indeed, based on the Commonwealth's offer of proof in connection with their Motion *in Limine*, we determined [Appellee's] drug use was irrelevant but reserved further decision on the issue to the time of trial, should the Commonwealth present further evidence that [Appellee's] drug use was relevant to the Criminal Homicide. See Opinion, 12/15/17, pp. 19-22. Accordingly, we find it disingenuous for the Commonwealth to aver on appeal that this [c]ourt erred in making a decision where the Commonwealth failed to offer evidence to sustain its burden.

*Id*. at 9.

Following our review, we find the Commonwealth's issues lack merit and affirm the trial court's Order.

Order affirmed.

Judge Stabile joins the Opinion.

Judge Strassburger concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/11/18