J-S24035-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PATRICK TIMOTHY KEARNEY | : | |
| | : | |
| Appellant | : | No. 1015 WDA 2020 |

Appeal from the Judgment of Sentence Entered July 2, 2020
In the Court of Common Pleas of Mercer County Criminal Division at
No(s): CP-43-CR-0000810-2018

BEFORE: DUBOW, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: SEPTEMBER 16, 2021**

Appellant, Patrick Timothy Kearney, appeals from the judgment of sentence entered in the Court of Common Pleas of Mercer County after a jury convicted him of multiple sexual offenses, including Rape, Indecent Deviate Sexual Intercourse ("IDSI"), and Aggravated Indecent Assault ("AIA"). Herein, Appellant maintains the court erroneously deemed admissible, under the "common plan/scheme" and "lack of accident" exceptions to Pa.R.E. 404's proscription against the admission of prior bad acts evidence, the testimony of another woman who alleged Appellant had raped her. Appellant also contends several of his offenses merge for purposes of sentencing. After careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

The present case stems from allegations brought forth by the victim, C.F.T., that Appellant raped her on their first date. The relevant facts, which are described in greater detail *infra*, are that Appellant and C.F.T. were little more than acquaintances when they arranged their date via Facebook text messaging.

On the night of the date, Appellant picked C.F.T. up at her home and took her for dinner, a drink, and a movie. At each location, however, Appellant made uninvited intimate advances, which C.F.T. repeatedly refused by pushing his hand away or shifting her body position to avert his attempts.

C.F.T. alleged Appellant ultimately raped her after the two stopped at his home on his suggestion that C.F.T., a dog lover, meet his dog for just a moment. According to C.F.T., Appellant "herded her" into his bedroom, quickly removed her clothing, and initiated uninvited sex. She claimed he then facilitated her anal rape though use of a two-handed, incapacitating chokehold that rendered her either unconscious or nearly unconscious.

Also admitted at C.F.T.'s rape trial was testimony from M.K., who alleged that four years prior to C.F.T.'s alleged rape she, too, was raped by Appellant on their first date. Like C.F.T., M.K. recounted how Appellant repeatedly placed his hands on her without her permission while at a bar, indicated they needed to make an unplanned stop at his apartment, forcibly carried her into his bedroom the moment they entered, tore her top off, and employed a two-handed chokehold on her as he began vaginal intercourse on his bed.

Prior to trial, the Commonwealth had provided notice of its intention to present M.K.'s testimony under the Rule 404(b)(2) exception to the rule against admission of prior bad acts evidence, to which Appellant filed a motion in *limine* contesting admission of such evidence as irrelevant and unduly prejudicial. The court held a Rule 404(b) hearing and determined that sufficient significant similarities existed between the two cases to admit M.K.'s testimony under either the common plan/scheme or lack of accident/mistake exception.

At the conclusion of trial, the jury found Appellant guilty on all counts, with the jury answering "yes" to the special interrogatory asking whether strangulation occurred in the course of C.F.T.'s sexual assault. On July 2, 2020, the court imposed consecutively-run, standard range sentences on all charges, resulting in an aggregate sentence of 15 ½ to 33 years' incarceration, to be followed by nine years' probation.

Appellant's initial post-sentence motions were denied, and the court granted privately retained counsel's motion to withdraw and appointed the public defender's office to represent Appellant. The trial court thereafter granted Appellant's *nunc pro tunc* request to file a supplement to the post-sentence motion and allotted 30 days for said motion, which was filed timely on August 20, 2020. On September 1, 2020, the trial court vacated its prior order denying post-sentence motions and entered a new order denying all post-sentence motions. This timely appeal followed:

Appellant presents for this Court's consideration the following two questions:

1. Whether the trial court abused its discretion in permitting the Commonwealth to present evidence of Appellant's alleged improper conduct?

2. Whether the trial court erroneously refused to merge the Appellant's sentences for the Involuntary Deviate Sexual Intercourse and Aggravated Indecent Assault with the Appellant's sentence for Rape by Forcible Compulsion since the offenses merged for sentencing purposes?

Appellant's brief, at 4.

In his first issue, Appellant contends the trial court abused its discretion when it ruled the testimony of Butler County complainant M.K. was admissible to show Appellant's actions in the present matter were not undertaken with C.F.T.'s consent but, instead, reflected a common plan/scheme to impose his will regardless of whether she consented. Specifically, Appellant posits that the two cases are better defined by their dissimilarities than their similarities. Whereas his first date with M.K. was a blind date preceded by only Facebook messaging, consisted of going to a bar or two for drinks, and lacked significant romantic interactions before returning to his apartment, Appellant argues, his first date with C.F.T. was preceded by two prior face-to-face encounters and involved romantic interactions during their evening out prior to returning to his home.

An additional difference according to Appellant is that M.K. alleged she was forcibly undressed and brought into the bedroom while verbally

protesting, while C.F.T. engaged in what he calls consensual vaginal intercourse. Finally, M.K. made no assertion of anal sex, whereas C.F.T. claimed she had been anally raped.

In considering this claim, we are mindful of the following:

> Admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. **See Commonwealth v. Arrington**, 624 Pa. 506, 86 A.3d 831, 842 (2014). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Sitler**, 144 A.3d 156, 163 (Pa. Super. 2016) (*en banc*) (citation omitted).
> Relevance is the threshold for admissibility of evidence. **See Commonwealth v. Cook**, 597 Pa. 572, 952 A.2d 594, 612 (2008). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Commonwealth v. Drumheller**, 570 Pa. 117, 808 A.2d 893, 904 (2002) (citation omitted). "All relevant evidence is admissible, except as otherwise provided by law." Pa.R.E. 402.
> One such law that limits the admissibility of relevant evidence is Rule 404. Under Rule 404, evidence of "a crime, wrong, or other act" is inadmissible "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). However, this evidence may be admissible when relevant for another purpose, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). "In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

> ***

> Merely crossing the threshold of demonstrating that other-acts evidence was probative of some Rule 404(b)(2) category does not, by itself, demonstrate

- 5 -

admissibility. "In a criminal case this evidence is admissible *only* if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2) (emphasis added). In this context, "'[u]nfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially."

*Commonwealth v. Dillon*, 592 Pa. 351, 925 A.2d 131, 141 (2007).

Often cited in conjunction with this balancing test, as invoked by the trial court in this case, is our Supreme Court's elucidation on the topic of prejudice in *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988):

Not surprisingly, criminal defendants always wish to excise evidence of unpleasant and unpalatable circumstances surrounding a criminal offense from the Commonwealth's presentation at trial. Of course, the courts must make sure that evidence of such circumstances have some relevance to the case and are not offered solely to inflame the jury or arouse prejudice against the defendant. The court is not, however, required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged, as appellant would have preferred.

*Id.* at 501.

Naturally, as the *Lark* Court suggests, relevant evidence of [a defendant's] culpability for the charged offenses should not be excluded merely because it tends to demonstrate his guilt.

\*\*\*

Thus, we must not forget that the rule being applied is that other-acts evidence is by default inadmissible *unless* a Rule 404(b)(2) category or similar justification applies, *and* the probative value of that evidence outweighs its *potential* for prejudice. The burden is on the party seeking admission to demonstrate the applicability of the exception to the general rule; in this case, that burden fell on the Commonwealth. There is no presumption of admissibility of other-acts evidence

merely because it is somewhat relevant for a non-propensity purpose.

*Lynn III*, No. 2171 EDA 2012, at 29–30, 2015 WL 9320082, at *14 (emphasis in original).

*Commonwealth v. Lynn*, 192 A.3d 165, 168–72 (Pa.Super. 2018).

In *Commonwealth v. Bidwell*, 195 A.3d 610, 618–19 (Pa.Super. 2018), this Court discussed key considerations in reviewing whether other crimes or bad acts show a common plan or scheme so as to come within the purview of 404(b)(2):

As a preliminary matter, as the Superior Court noted in *Commonwealth v. Weakley*, a court must necessarily look for similarities in a number of factors when comparing the methods and circumstances of other crimes sought to be introduced through Rule 404(b), including:

(1) the manner in which the crimes were committed; (2) weapons used; (3) ostensible purpose of the crime; (4) location; and (5) type of victims. Remoteness in time between the crimes is also factored, although its probative value has been held inversely proportional to the degree of similarity between crimes.

*Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa. Super. 2009) (internal citation omitted).

To show a common plan or scheme, crimes must be so related that proof of one tends to prove the others. *Commonwealth v. Elliott*, [549 Pa. 132,] 700 A.2d 1243, 1249 (Pa. 1997), *abrogated on other grounds by Commonwealth v. Freeman*, [573 Pa. 532,] 827 A.2d 385 (Pa. 2003). Similarities cannot be confined to insignificant details that would likely be common elements regardless of the individual committing the crime. *See Commonwealth v. Hughes*, [521 Pa. 423,] 555 A.2d 1264, 1283 (Pa. 1989). Evidence of a common scheme can establish any element of a crime, such as identity and mental state, so long as the scheme is not being used just to establish a propensity of the defendant to commit crimes. *See Commonwealth v. Miller*, [541 Pa. 531,] 664 A.2d 1310, 1318 (Pa. 1995), *abrogated on other grounds by Commonwealth v. Hanible,* [575 Pa. 255,] 836 A.2d 36 (Pa. 2003).

In determining if prior incidents show a common plan or scheme, the [c]ourt should focus not just on a defendant's actions, but on the factual circumstances of the incidents in their entirety. ***See Commonwealth v. O'Brien***, 836 A.2d 966, 970-71 (Pa. Super. 2003). Stated differently, the similarities of the incidents need not lay solely in the perpetrator's acts, but in the shared similarities in the details of each crime. ***See Commonwealth v. Newman***, [528 Pa. 393,] 598 A.2d 275, 278 (Pa. 1991).

***Bidwell***, 195 A.3d at 618–19.

As noted above, the Commonwealth filed notice of its pre-trial intent to introduce Pa.R.E. 404(b) evidence through the testimony of M.K., a complainant in a then-pending[1] Butler County criminal case who alleged that her first date with Appellant in the summer of 2014 ended in rape. Specifically, M.K. asserted that Appellant made an unscheduled stop at his home, suddenly lifted her over his shoulder and carried her into his bedroom without her permission and despite her earlier refusals of his advances, forcibly removed her clothing, ignored her protestations against sex, and choked her to an incapacitated state while initiating vaginal intercourse. N.T., 8/7/19, at 5-8; N.T. 2/20/20 at 72-80.

According to the Commonwealth's notice, such evidence was admissible under both the common plan/scheme and the absence of accident/mistake exceptions to show Appellant enabled the rape of C.F.T. through substantially similar means of strategy and physical force culminating with the use of an overwhelming stranglehold to facilitate the sexual intercourse of Appellant's

_____

[1] The Butler County case was scheduled for jury trial on the day after the Rule 404(b) hearing in the present matter.

- 8 -

choosing. In response, Appellant filed a motion in *limine* to exclude such testimony.

On August 7, 2019, the trial court conducted a hearing on Appellant's motion to exclude the proposed testimony of Commonwealth witness M.K. The Commonwealth presented the record obtained during discovery of each alleged victim's video interview with Pennsylvania State Trooper Tyler Craig, and it argued the Butler County evidence was not only relevant but highly probative on the question of consent given the private setting of the alleged crime and the consequential lack of witnesses.

With respect to the similarities between the two allegations, the Commonwealth submitted the following list:

1) The sexual assaults occurred during first dates with each victim;

2) Appellant took both victims to bars and/or restaurants as part of the first dates;

3) Appellant drove his vehicle as the means of transportation for both Appellant and the victim;

4) Appellant made each victim feel uncomfortable through unwelcomed verbal and physical advances during the date;

5) Appellant manufactured a reason to stop at his residence prior to returning each victim to [her] respective residences before the date ended;

6) While at the Appellant's residence, the victim was forcibly taken into Appellant's bedroom;

7) Each victim had her clothes removed by Appellant without consent;

8) Appellant removed his own clothing in each incident, without any request by the victim;

9) Each victim was raped and otherwise sexually assaulted without consent;

10)    Appellant choked both victims by grasping the neck with his hands and applying considerable pressure;

11)    In each instance, the victim asked Appellant to stop and he ignored the plea;

12)    In each instance, Appellant fell asleep immediately following the incident; and

13)    In each instance, Appellant did not return the victim home until the next morning.

*See* Certified Record, Doc. No. 34; *see also* N.T. at 10-13.

The trial court denied Appellant's Motion in *Limine* by its Order and Opinion of September 20, 2019, upon finding the Butler County case was sufficiently similar in several significant ways to grant its admission under Rule 404(b).  Specifically, the court observed:

> The Commonwealth's proffer of evidence came from recorded interviews by a state trooper of both the Mercer and Butler County victims as follows:  Both victims are white females within three inches of height of each other and generally of a similar age. Transcript at 13.  The Mercer County victim and the defendant had prior face to face interactions for several months and [on the night in question] went to dinner, a movie and a bar for drinks prior to going to the defendant's house, although there is no evidence of intoxication.  At defendant's house, he led her by hand to his bedroom without any indication of force or crazy look in his eyes [unlike observation made by the Butler County victim in her case], and they both voluntarily removed their clothes and engaged in consensual vaginal intercourse, after which the defendant allegedly rolled her onto her stomach, choked her and forcibly had anal intercourse with her.

As to the Butler County victim, there was no vaginal[2] intercourse at all and it was the first time the defendant allegedly met the victim although they had some prior communications with each other. She sustained a bite mark on her inner thigh after the two of them went barhopping and the defendant may have been intoxicated when they arrived at his home when he was reported to having a crazy look in his eye and forcibly carried her up to his bedroom and forcibly removed her clothes, choked her and proceeded to have nonconsensual anal [sic] intercourse with her.

The thrust of the Commonwealth's argument is that the need for the Butler County evidence regarding forced anal intercourse with a white female of the approximate same height and age is critical particularly in the Mercer County case to prove a lack of consent to anal intercourse because of the consensual vaginal intercourse the parties had prior to the unconsented-to contact. Furthermore, the defendant choked both of the alleged victims according to the Commonwealth to subdue them into complying with his desire to have anal intercourse.

While there are several dissimilarities between these two alleged sexual assaults, 404(b) evidence is not required to be identical to overcome the unfair prejudice hurdle. The Commonwealth's need for this evidence is acute here because the parties had consensual vaginal intercourse before the alleged forced anal intercourse. Moreover, the Mercer County's victim's testimony is uncorroborated and the Butler County victim's testimony would show the common scheme or plan with regard to choking [] white female[s] of similar ages and sizes to force them to have nonconsensual anal intercourse with the defendant.

Accordingly, it is the finding of the court that the proposed testimony from the Butler County victim shall be admissible in the defendant's trial in Mercer County under Rule 404(b) to show a common scheme or design and to negate the defense of consent.

---

[2] The trial court misconstrued the evidence with respect to the type of rape involved in the Butler County case, as the victim, M.K., alleged vaginal rape, not anal rape. For reasons discussed *infra*, the court's transposition in this regard was inconsequential where trial testimony established significant similarities triggered the 404(b)(2) exception, particularly Appellant's resort to an overwhelming choke-hold of his date to enable or facilitate sexual intercourse of his choosing, regardless of her lack of consent.

Order, 9/20/19, at 4-5.

At trial, C.F.T. testified that she first met Appellant on either Christmas Eve or Christmas Day of 2017, when she went by herself to a Mercer County bar and grill where Appellant was working as a bouncer. N.T., 2/19/20, (A.M. Session) at 8. They met again under the same circumstances on New Year's Eve night, and thereafter became Facebook "friends" and occasionally exchanged messages. N.T. at 8-10.

On March 31, 2018, C.F.T. responded positively to Appellant's Facebook invitation to a party, and Appellant replied "I hope so, babe. I'd really love to take you out tonight." N.T. at 14. The two exchanged ideas about where to go, although Appellant lamented his schoolwork obligations were limiting their options, to which C.F.T. said, "Goodness. That's fine. If you don't have time tonight it's really okay. I'm not going anywhere. No Pittsburgh is great with me. LOL." Appellant replied, "Laugh out loud. I can make time to hang out with a beautiful classy woman for a while. I am heading home now to get cleaned up." N.T. at 18.

Appellant continued to use intimate pet names like "babe" and "love" in subsequent texts even though C.F.T. did not respond in kind and despite the fact the two were mere acquaintances texting one another on where to go for a casual date. For example, to C.F.T.'s suggestion that "[i]f it helps for me to meet you somewhere, just let me know. Don't want you spending extra time on the road [when] you could be doing what you need to do[,]" Appellant replied, "Laugh out loud. Spending time with you is exactly what I need to be

doing, babe." *Id*. When C.F.T. gave Appellant directions to her home, Appellant later indicated, "I'm not sure where to turn in there, love." N.T. at 20.

According to C.F.T., the drive to their restaurant destination largely consisted of her having to push Appellant's hand off her leg as he repeatedly tried to slide it up her thigh while squeezing. N.T. at 22. C.F.T. testified that she never said, "no," but instead relied on her physical response to send a clear message of disapproval. She related at trial her surprise at his behavior by noting she had not even considered the night a date but, rather, just "hanging out with a person I had met that I thought was a friend." N.T. at 23.

At the restaurant, C.F.T. continued to rely exclusively on her physical responses of disapproval as she would pull away or turn her back to Appellant when he slid close to her in the booth and put his arm around her. N.T. at 24. She testified Appellant remained "handsy" when they stopped for a quick drink on the way to the movie theater.

While seated at the theater, Appellant allegedly stuck his hand down the front of C.F.T.'s pants and managed to penetrate her vagina with his finger momentarily. N.T. at 27. She maintained that she tried to adjust herself to displace his hand, but he kept it there for much of the second half of the movie. N.T. at 28. C.F.T. testified she did not get up and leave the theater because she wished to avoid "making a scene." *Id*.

Once back to Appellant's car, C.F.T. told him she wanted to go home. N.T. at 29. Appellant unbuttoned her pants and tried to insert his hand, and C.F.T. again pulled away and said, "I'm so sorry, I'm not ready for this, please take me home." N.T. at 30. Appellant's response was to undo his own pants, take C.F.T.'s hand, and place it on his penis. When C.F.T. said "no, I am not ready for this," Appellant replied "you only live once. You gotta live." *Id*.

Appellant agreed to take C.F.T. home at that point, but first he stopped at a cemetery, where he pulled the car behind some trees. N.T. at 36. He moved his seat back, lifted the self-described petite C.F.T. off her seat, and placed her on his lap. N.T. at 36-37. She testified that he began to kiss her and she allowed it to happen briefly before pushing him away repeatedly, at which he again said he would take her home. N.T. at 38.

Appellant drove past C.F.T.'s street several times despite C.F.T. telling him when to turn. N.T. at 40. He ignored her every time and eventually suggested she meet his dog. C.F.T. testified Appellant knew from her Facebook posts that she loves dogs, and she agreed to his suggestion but said she could stay for only a minute. N.T. at 40.

On the way to Appellant's home, Appellant told C.F.T. that she looked terrified, and C.F.T. said she was terrified but would choose to trust him. N.T. at 42. Once at Appellant's home, C.F.T. played with the dog, and took it for a walk outside before returning to the living room where she sat with the dog. N.T. at 51.

The next moment, C.F.T. felt herself being pulled to her feet and "herded" to the bedroom as Appellant held her tightly around the waist and pushed her in that direction. N.T. at 52. He picked C.F.T. up, laid her on the bed, and started to undress her. N.T. at 53. She testified, "[he] pulled my shirt off, pulled my pants and my underwear off like at the same time. And I was like, well, don't I even get to keep my underwear[?]", to which he said, "no." *Id*.

Appellant kissed her briefly before he unilaterally performed oral sex on her. N.T. at 54. C.F.T. testified that she just lay there "because I figured he was going to do what he wanted no matter what I did because he is a big guy. . . . Not going to matter, so get it over with and get me home." *Id*. C.F.T. could not recall if she ever said "no" during this time, although she testified, "I don't remember saying [']no['] other than I thought that telling somebody that I don't want to go home with him and I wasn't even ready to touch their penis was enough." *Id*. When asked if she thought saying no would have done any good, she answered, "No. I knew it wouldn't." N.T. at 55.

Appellant came up and began vaginal intercourse with C.F.T. still lying on her back. *Id*. C.F.T. could not recall how long that lasted, but she described it did not seem very long before Appellant picked her up "really quick and rough" and "twisted me around and threw me on my stomach." N.T. at 56. Appellant did not ask permission to do this and C.F.T. did not voluntarily change position. *Id*.

C.F.T. testified that Appellant resumed vaginal sex from behind but then placed his hands around her neck and "squeezed so hard that I couldn't – I just completely lost consciousness. I couldn't see. I couldn't breathe. I couldn't hear anything. Everything went black and I thought I was dying." N.T. at 57. She claimed she was "fighting to get something, grab anything, trying to get away. . . . I was flailing. . . . I said I couldn't breathe. Stop; I can't breathe. . . . [I said it] [a]s many times as I could get any noise out. But there was none. I couldn't – eventually, like nothing came out." N.T. at 58.

C.F.T. maintained she lost consciousness and awoke to a feeling of "excruciating pain in my anus." *Id*. She knew it was from Appellant's penis because he said, "'Do you like my big dick in you[?]'. And I said, 'No, please God, make it stop.' Over and over, screaming." *Id*. According to C.F.T., Appellant persisted until he finished, despite her pleading. N.T. at 59-60. She curled up in a ball and lay still on the bed before tending to herself in the bathroom, where she experienced a bloody discharge from her anus that she believed contained Appellant's semen. N.T. at 60.

CFT sought a ride home from another source and called her son. Phone records confirmed C.F.T.'s testimony that she called her son briefly, but she testified that her phone lost its charge before she could determine and recite Appellant's address. She returned to the bedroom and slept the night in Appellant's bed until morning, when Appellant again initiated vaginal intercourse and C.F.T. offered no resistance. N.T., 2/19/20 (P.M. session), at

40-43. Appellant then agreed to take her home, but not before going to a restaurant for breakfast and to Walmart, where Appellant alone walked in, purchased a Plan B oral contraceptive, and directed her to take it, which she did before he resumed driving her home. N.T. at 43-49, 64-65, 78.

The next day, C.F.T. shared her experiences with a friend who takes a yoga class that C.F.T. teaches, and the friend advised her to seek counseling at a local agency, AWARE. N.T., 2/19/20 (A.M. session), at 86. C.F.T. called that day and took the earliest available appointment, which was 10 days later. She met with a counselor, where she insisted she could not allow another person to go through the same experience with Appellant. N.T., 2/19/20 (A.M. session), at 83. The counselor recommended that C.F.T. call a legal advocate, which C.F.T. did, and the advocate advised her to talk to police. Appellant went to the State Police barracks the next day and gave a detailed account of her experience with Appellant. *Id*.

C.F.T. insisted at trial that she never consented to any of the sex acts described, as she never said "yes" to anything. N.T. at 61. Given the circumstances that she described in her earlier testimony, she reiterated that she felt she had no choice but to go along with Appellant's advances while at his home. N.T. at 62.

M.K. testified to the events surrounding her own alleged rape at the hands of Appellant. In the summer of 2014, M.K. and Appellant first communicated with one another on Facebook via text messages. N.T. at 2/20/20, at 65. About three weeks later, Appellant asked her out on a date

and M.K. agreed. *Id*. Appellant's stated plan was that he would pick up M.K. at her home, they would go out for a few drinks, and then go to Appellant's home to meet his parents. *Id*.

Their evening together started with Appellant taking M.K. to a VFW bar, where, according to M.K., they were having a good time but she felt Appellant was "already, I guess, too touchy. I kind of felt uncomfortable in the beginning. . . . I mean, he was grabbing my butt and things like that." N.T. at 68. M.K. testified that he kept putting his arm around her shoulders and her waist, and she told him she was uncomfortable with his doing so. N.T. at 70. She said that he stopped touching her for that time. *Id*.

M.K. admitted to having at least two drinks at the first location, and she could not recall if they went to another bar that evening before Appellant said during their car ride that he needed to stop at his apartment to get something. N.T. at 71. When they arrived, M.K. agreed to go into the apartment so she could use the bathroom. *Id*.

As soon as the two entered Appellant's apartment, he picked M.K. up, slung her over his shoulder, and carried her into his room. N.T. at 72-73. No one else was home. N.T. at 73. According to M.K., she was confused and said, "no, what are you doing?" *Id*. She could not remember receiving a reply from Appellant before he literally ripped off her shirt and bra and placed her on his bed, where he removed the rest of her clothing. N.T. at 73-74. M.K. confirmed that Appellant neither asked nor received permission to

remove M.K.'s clothing, as she maintained she was saying "no" during this time.  N.T. at 75.

M.K. was uncertain when Appellant had removed his clothes, but she recounted how he began to apply a painful chokehold as he inserted his penis into her vagina.  N.T. at 78.  Specifically, she was on her back with her head hanging over the side of the bed while he was on top of her with both hands around her neck applying enough pressure making it impossible for her to either speak or breathe.  N.T. at 78-79.

M.K., who described herself as 5'1" tall and 100 pounds at the time, could not move while under Appellant's grip, and she believes he ejaculated inside her, at which point he removed his hands from her neck and placed his face between her legs to deliver a very painful bite to the inside of her upper thigh.  N.T. at 75, 89, 95-96.  Appellant then rolled over, lay there for some time, and fell asleep.  N.T. at 81.

M.K. left the bedroom, dressed herself in her pants and jacket, and may have fallen asleep for some time before the morning.  N.T. at 82.  Appellant woke up around 8:00 or 9:00 a.m., and M.K. asked him to take her home, which he did.  N.T. at 83-84.  M.K. told her mother what happened, and her mother asked if M.K. wished to report the event to police, but M.K. was too scared to come forward at the time.  N.T. at 86.  It was not until M.K. read a news report about the charges filed in the present case that she contacted police.  N.T. at 87.

The significant similarity between these two acts, therefore, consisted of Appellant's tactic of dating a woman of small stature, taking her for a drink and a night out, and making a spontaneous suggestion they stop at his home where he suddenly physically forces the date into the bedroom and facilitates intercourse with a stranglehold of the neck that incapacitates his date and nullifies any attempt to offer vocal or physical opposition. That the rape was exclusively vaginal in one case and both vaginal and anal in the other is not an admission-defeating discrepancy under the facts, as the purpose and timing of the strangulation in the Butler County case mirrored that of the present case and, thus, represented unique and critical support to C.F.T.'s lack-of-consent testimony forming the basis to her accusations.

Additionally, M.K.'s testimony was highly probative to the issue of consent in the present case precisely because there were no witnesses to the encounter here in question and because C.F.T. admitted she no longer offered physical resistance and never said "no" or "stop" to Appellant's advances from when he physically ushered her into his bedroom until the moment he choked her during vaginal intercourse, at which point she allegedly attempted unsuccessfully to struggle against him and gasp her plea of "stop." The Commonwealth's theory in this respect, therefore, asserted this was a case of a victim's will overcome by a larger, stronger aggressor who persisted and prevailed in getting what he wanted.

To this end, the jury heard C.F.T.'s testimony that she spent the better part of the night quietly deflecting or limiting Appellant's unsolicited sexual

advances but felt it was futile to resist him in his remote, rural home when he "herded" her to the bedroom without asking for or receiving her permission, pulled off her clothing, and quickly progressed from oral sex to vaginal intercourse. Instead, apart from making one final request in vain to keep her underwear on,[3] C.F.T. felt resigned to offer no physical or verbal opposition, and she just lay motionless in the hope it would soon end, according to her testimony.

This was not consent, the Commonwealth maintained. Instead, C.F.T.'s resignment in Appellant's bedroom was presented as a self-preservation response to what she saw as the inevitability of Appellant forcing her to submit to his sexual demands. Indeed, the trial court instructed the jury that a rape conviction does not require evidence that a complainant show she put up a fight or resisted, but requires instead only that a defendant compelled sexual intercourse against the complainant's will. It was in this ongoing context of compulsion, the Commonwealth posited, that Appellant forcibly flipped C.F.T. over and strangled her as she flailed and struggled against it while being vaginally and then anally raped.

We therefore find logically connected to C.F.T.'s assault the experience of Butler County victim M.K., whose largely analogous social media-arranged first date with Appellant began with uninvited physical familiarity and ended

---

[3] As noted *supra*, C.F.T. did attempt to limit Appellant's sexual advances as he was quickly pulling off her clothes without invitation when she asked, "I don't get to keep my underwear?" This request to remain dressed in her underwear implicitly indicated her objection to intercourse, but he said, "no."

with a promised brief stop at his home turning into a bullrush into the bedroom and a rape-enabling stranglehold depriving M.K. of breath and any further words of protest.  The similarities between the two cases thus manifested a signature method that went beyond ordinary details typical of crimes of this class and, instead, distinguished them as reflective of Appellant's common scheme and plan that significantly strengthened the Commonwealth's lack-of-consent case and brought M.K.'s testimony into the scope of Rule 404(b)(2).

Decisional law of this Commonwealth has upheld admission of other crimes evidence under Rule 404(b)(2) in circumstances substantially similar to those presented here.  *See*, *e.g.*, *Elliott*, 700 A.2d at 1250 (logical connection found where three women in their twenties were choked, beaten or both in separate, early morning hour incidents, while alone with defendant after leaving same bar), and *Miller*, 664 A.2d at 1318 (logical connection found where defendant lured women of similar appearance into his car, took them to remote areas to rape and beat them in a similar manner).  *See also Commonwealth v. Hicks*, 156 A.3d 1114, 1126 (Pa. 2017) (plurality) (discerning strong similarities among defendant's prior relationships and present one with complainant, where evidence involved his use of hands or a sharp object to inflict injuries to the necks of drug-dependent women of similar body-types when he disapproved of their behavior).  For the foregoing reasons, we find no error with the admission of relevant and highly probative Rule 404(b)(2) evidence at trial.

In Appellant's second issue, he challenges the trial court's sentencing scheme for failing to merge his sentences for IDSI and AIA with his sentence for rape as all three convictions were based on the same act of anal intercourse. We disagree.

"A claim that crimes should have merged for sentencing purposes raises a challenge to the legality of the sentence." **Commonwealth v. Leaner,** 202 A.3d 749, 784 (Pa.Super. 2019). "When reviewing the legality of a sentence, our standard of review is *de novo* and our scope of review is plenary." **Commonwealth v. Lekka,** 210 A.3d 343, 355 (Pa.Super. 2019)(citation omitted).

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765. The statute thus "prohibits merger unless two distinct facts are present: 1) the crimes arise from a single criminal act; and 2) all of the statutory elements of one of the offenses are included in the statutory elements of the other." **Commonwealth v. Baldwin**, 604 Pa. 34, 985 A.2d 830, 833 (2009).

Here, Appellant contends his sentences for both IDSI and AIA merge with that for Rape because all three convictions stem from the same act, namely, Appellant's anal rape of C.F.T. We disagree. The evidence established that each of the crimes charged was a separate and distinct act. Appellant committed rape when he penetrated C.F.T. vaginally with his penis

up to and through the time he applied a stranglehold upon C.F.T. and continued intercourse despite her plea to stop, committed IDSI when he penetrated C.F.T. anally with his penis while she was nearly or completely unconscious, and committed AIA when he penetrated C.F.T. anally with his thumb. Thus, the charges of rape, IDSI, and AIA were not based on a "single criminal act" as required by Section 9765 for merger of sentences, and Appellant's second issue merits no relief.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/16/2021